**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SUSAN RAGUSA** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  18-3362** |
| | : | |
| **LEHIGH UNIVERSITY** | : | |

**MEMORANDUM**

**SCHMEHL, J.    /s/ JLS**                                                **March 29, 2021**

Plaintiff brought this action, claiming the Defendant Lehigh University improperly

terminated her employment because of her disability in violation of the Americans with

Disabilities Act, as amended, 42 U.S.C. § 12101, *et seq*. ("ADA")(Count I), the

Pennsylvania Human Relations Act, as amended, 43 P.S. § 951 *et seq*. ("PHRA")

(Count II) and in response for exercising her rights under the Family and Medical Leave

Act, 29 U.S.C. § 2601, *et seq*. ("FMLA")(Count III). Presently before the Court is the

Defendant's motion for summary judgment. For the reasons that follow, the motion is

granted in part and denied in part.

**BACKGROUND**

Plaintiff was hired by Defendant in 2008 as a Lighting Coordinator at the

Defendant's Zoellner Arts Center ("Zoellner") and as an Adjunct Professor. In August,

2015, Plaintiff was diagnosed with endometrial cancer and, after starting treatment,

developed adrenal insufficiency.  During the late fall of 2015, the Defendant reduced

Plaintiff's work hours from 40 to 35 per week on a temporary basis.

Plaintiff requested a medical leave of absence under the FMLA, which the

Defendant approved. Plaintiff's FMLA leave commenced on January 4, 2016 and lasted

1

until early April, 2016. At the end of May 2016, Plaintiff reached out to Defendant's Human Resources about returning to work on a part-time basis, limited to 20 hours per week, performing only "desk work." On June 10, 2016, the Defendant denied Plaintiff's request to return to work part-time.

In July 2016, Plaintiff lodged an internal complaint with Defendant's Equal Opportunity Compliance Coordinator regarding the denial of her request to return to work on a part-time basis. Plaintiff claimed the defendant was discriminating against her on the basis of her disability. Several meetings took place in July and August 2016 involving Plaintiff, Human Resources, and Zoellner management, to discuss Plaintiff's return to work on a full-time basis, but with a requested accommodation of working no more than 40 hours per week and eight hours per day.

During a meeting on August 4, 2016, Plaintiff and her supervisors agreed to certain accommodations for a specified period of time. Defendant agreed to Plaintiff's requested accommodation of a 40-hour per week restriction but noted that this restriction would not be sustainable after September 22, 2016, due to the increase in the number of productions at Zoellner and the resulting increased work hours.

Plaintiff returned to work on August 8, 2016 but did not teach any classes during the fall 2016 semester. Plaintiff also opined that, given her slow recovery, it would be better if someone else taught her spring 2017 classes. At a meeting on October 4, 2016, an agreement between Plaintiff and Defendant could not be reached regarding Plaintiff teaching in the spring 2017 semester. Plaintiff was notified of her termination in November, 2016.

**STANDARD OF REVIEW**

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id. (citing *Anderson*, 477 U.S. at 248).

Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. See *Anderson*, 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**DISCUSSION**

Defendant first moves for summary judgment on Plaintiff's disparate treatment claim brought under the ADA.[1] Plaintiff actually asserts three separate violations of the ADA in Count One: discrimination, failure to accommodate and retaliation.  In order to establish a prima facie case of disparate treatment under the ADA, a plaintiff must show "(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [s]he has suffered an otherwise adverse employment decision as a result of discrimination." *Shaner v. Synthes* , 204 F.3d 494, 500 (3d Cir. 2000) (citing *Gaul v. Lucent Techs., Inc*., 134 F.3d 576, 580 (3d Cir. 1998)).

There is no dispute that Plaintiff has satisfied the first and third elements of her prima facie case of disparate treatment under the ADA.  However, the Court finds that

---

[1] As noted above, Plaintiff has also brought her disability discrimination claim under the Pennsylvania Human Relations Act ("PHRA"). An "analysis of an ADA claim applies equally to a PHRA claim." *Taylor v. Phoenixville School Dist.,* 184 F.3d 296, 306 (3d Cir.1999) (citing *Kelly v. Drexel Univ.,* 94 F.3d 102, 105 (3d Cir.1996)). Accordingly, the Court will only discuss Plaintiff's ADA claim because the analysis is the same for the PHRA claim.
7

there are genuine issues of material fact as to whether Plaintiff was "otherwise qualified."

For a plaintiff to be "qualified" under the ADA, she "must 'satisf[y] the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.' and, she must be able to 'perform the essential functions of the position held or desired, with or without reasonable accommodations.' " *Taylor*, 184 F.3d at 311 (first alteration in original) (quoting *Gaul,* 134 F.3d at 580)).  There is no dispute that Plaintiff has the appropriate educational background and employment experience to perform the job of lighting coordinator and adjunct professor with Defendant. The issue concerns whether Plaintiff can perform the "essential functions" of that position.

Defendant argues that an essential element of Plaintiff's job as lighting coordinator/adjunct professor is that she be able to work more than 40 hours per week and contends that because Plaintiff cannot do so, with or without reasonable accommodation, she is not "qualified" under the ADA. Plaintiff responds that working more than 40 hours per week was not an essential function of her job as lighting coordinator/adjunct professor.

It is well established that "[w]hether a particular function is essential is a factual determination that must be made on a case by case basis [based upon] all relevant evidence." *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 612 (3d Cir. 2006) (quoting *Deane v. Pocono Medical Ctr*., 142 F.3d 138, 148 (3d Cir. 1998)); see also *Skerski v. Time Warner Cable Co*., 257 F.3d 273, 279 (3d Cir. 2001) (same). In addition to stating that the essential function determination is a factual question, our

Court of Appeals has recommended that it should typically be left for the jury to decide. See *Deane, 142 F.3d at 148* (refusing to grant summary judgment on the basis that the question of whether lifting heavy objects was an essential function of a nurse was a fact question for the jury); see also *Skerski, 257 F.3d at 280* (reversing district court's holding that climbing was an essential function of installer technician and cautioning against snap judgments regarding essential functions); *Turner, 440 F.3d at 613* ("[T]he fact issue as to `essential function' must be decided by a jury.").

Whether a job duty is an "essential function" turns on whether it is "fundamental" to the employment position. 29 C.F.R. § 1630.2(n)(1); *Turner,* 440 F.3d at 612 (quoting 29 C.F.R. § 1630.2(n)(1)). The term "essential function" does not include the "marginal" functions of the position. *Id*. at § 1630.2(n)(1).

> The regulations further set forth a non-exhaustive list of seven examples of evidence that are designed to assist a court in identifying the `essential functions' of a job. They include: (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; (5) the terms of a collective bargaining agreement; (7) the work experience of past incumbents in the jobs; and/or (7) the current work experience of incumbents in similar jobs.

*Skerski,* 257 F.3d at 279 (citing 29 C.F.R. § 1630.2(n)(3)).

There is conflicting evidence in the record as to whether working more than 40 hours per week is an essential function of Plaintiff's job. On the one hand, Defendant's Interrogatory Responses claim that any duty identified as an "accountability" on Plaintiff's Position Description are the essential functions of the position. Interrogatory No. 6 (ECF 74-11, Ex. 19, at p. 4.) Yet, working more than 40 hours per week is *not*

listed as an "accountability" ("key" or otherwise) in Plaintiff's Position Description, nor does the "Position Purpose" section identify working more than 40 hours per week as an essential component of the job's purpose; *see generally* Lehigh Ragusa 919-922 (ECF 74-13, Ex. 32.)

In addition, Judith Zavalydriga ("Zavalydriga"), the Defendant's Director of Employee Relations, Performance Management and Workplace Learning during the time that Plaintiff was employed, Zavalydriga Tr. 10:23-24, 11:1-2 (ECF 74-8, Ex. 4), testified at her deposition that in determining whether or not a specific job duty was essential to a position, "[t]he position description is really what we relied on, and the – also the input from the department as to what was essential. The accountability's [sic] in the job description." Zavalydriga Tr. 27:8-11. Zavalydriga further testified that "[o]ur job descriptions list accountabilities. Those accountabilities are, for the most part, essential functions of the job." Zavalydriga Tr. 28:19- 22. Zavalydriga testified that Human Resources provided guidance to department managers in creating job descriptions. Zavalydriga Tr. 27:19-20. Zavalydriga further testified that department managers provided input as to what duties were essential. Zavalydriga Tr. 27:4-11. Zavalydriga testified that she understood that the term "essential job functions" means "those duties that are essential to the job and why she was hired and is accountable for those." Zavalydriga Tr. 26:21-23.

Furthermore, the Administrative Director of Zoellner, J. Andrew Cassano ("Cassano"), testified at his deposition that the essential functions of Plaintiff's job were to "oversee all of the technical lighting services for all productions at Zoellner Arts Center; to provide teaching services for the Department of Theater; to supervise any

staff that reported to her or was assigned to report to her, and general oversight of the lighting department for Zoellner Arts Center." Cassano Tr. 41:7-17 (ECF 74-7, Ex. 3.) Cassano further testified that Accountabilities 1-6 that are listed in Plaintiff's job description are "the essential functions of [Plaintiff's] job." Cassano Tr. at 42:13-24; 43:1-3.

On the other hand, a yearly average of 55-60 hours per week with peaks of 90 hours per week during large productions, while not listed as part of the Position Description nor in the Accountabilities section of the Position Description, is in fact listed in the portion of the Position Description entitled "Work Schedule and Travel."  Lehigh Ragusa 924 (ECF 74-13, Ex. 32.) The Work Schedule and Travel Section provides that there is a yearly average of 55-60 hours per week with additional Peaks of 90+ hours/week during Volume/Workload or Overtime during large productions as well as Required to be On Call for 90+ hours/week during large productions.  *Id.* See also, Ragusa Tr. at, 91:15-25, 92:1-25, 93:1-2. (ECF 74-12.)

In addition, Zavalydriga admitted that the Position Description does not provide final guidance on whether working more than 40 hours per week was an essential function of Plaintiff's job. Zavalydriga Tr. dep., 35:22-36:19, 37:2-8 (ECF 74-8, Ex. 4.) Zavalydriga further admitted that the Position Description does not provide final guidance on what the essential functions of a job are and that a duty is not necessarily an essential function of a position simply because it is listed in a Position Description as a key accountability. Zavalydriga Tr. 33:2-9, 38:23-39:18 (in part "I can't say that every accountability is necessarily an essential function as a blanket statement.") Zavalydriga

testified that in order to be sure a job function was essential, she would have to discuss it with both the employee and the employee's manager. Zavalydriga Tr., 37:5-19.

Furthermore, Cassano testified that it was not possible that employees of Zoellner would ever work less than 40 hours a week, outside of times when they took vacation time or sick time. Cassano Tr. 51:20-24, 52:1-4. (ECF 74-7, Ex. 3.) Cassano could not recall any occasion on which a Zoellner full-time exempt employee worked less than 40 hours per week. Cassano Tr. 52:6-16. Cassano further testified that Plaintiff was required to work more than 40 hours per week in her role as Lighting Coordinator. Cassano Tr. at 50:20-23, 55:5-23.

On July 27, 2016, Josh Kovar, Zoellner's Production manager, emailed Zavalydriga, Linda Lefever, one of Defendant's Human Resources Associates and Karen Salvemini, Defendant's Equal Opportunity Compliance Coordinator with a copy to Cassano regarding, *inter alia*, what Kovar viewed as areas of concern including his belief that Plaintiff's work hour restrictions were not compatible with the needs of Zoellner due to the long hours required for Zoellner events such as theatre tech week, Gala, Choral Arts Week, and the Nutcracker. Kovar Email dated 7/28/16, (ECF 71-70, Ex. 66) [Lehigh Ragusa 001019-1022]

On August 4, 2016, Plaintiff met with Salvemini, Cassano, Kovar and Zavalydriga to discuss her requested accommodations and return to work. Ragusa Tr. at 108:13-17, 300:9-17, 304:3-14 (ECF 74-12.). Plaintiff confirmed that during the meeting, Kovar expressed concern with Plaintiff's restrictions of 40 hours per week and 8 hours per day. Ragusa Tr. at 108:18-25, 109:1-3, 321:17-20, 24-25. Plaintiff pointed out that she had a reduced hourly and weekly workweek in 2015. *Id*. Kovar responded that the

arrangement in 2015 had not been successful. Kovar further noted that because of the 2015 situation, he was "starting off the new academic year with a 'burnt-out staff.'" Kovar was concerned about Plaintiff's hourly restrictions following her complete absence from work. Kovar further noted that there was a high volume of events in October, including the Gala, and later in March. (ECF 71-71, Ex. 67.) [Ragusa 330-332].

According to Plaintiff, Cassano stated at the meeting that Plaintiff's "leadership had been sorely missed the past seven months." Ragusa Tr. 110:3-25, 111:1-15, 322:1-10; (ECF 71-71, Ex. 67) [Ragusa 330-332.] During the meeting, the dialogue centered on the requested accommodation of hourly work limitations of 40 hours per week, 8 hours per day, and lifting/climbing restrictions as certified by Plaintiff's physician through August 15, 2016. According to Plaintiff, Cassano stated that the physical restrictions of lifting and climbing could be accommodated. Ragusa Tr. at 304:10-23. However, the hourly work restrictions were noted as an issue. Plaintiff's 40 hour per week restriction could only be accommodated from August through September 22, 2016. Ragusa Tr. 305:3-17. "This Fall schedule is not predicted to be sustainable throughout the semester without additional hours per day, and flexibility. Production demand will increase and often two [shows] at the same time. Sue will seek updated physician input from Dr. [Perilli] prior to September 2." (ECF 71-72, Ex. 68) [Lehigh Ragusa 001014; Kovar Tr. at 246:17-24, 247:1-4 (ECF 74-6.)

Plaintiff also testified that it was discussed during the meeting that "the fall schedule is not predicted to be sustainable throughout the semester without additional hours per day and flexibility." Ragusa Tr. at 306:9-17 (ECF 71-6.). Plaintiff admitted that "production demand will increase following September 22nd" and there are "times that

there are two productions going on at the same time." Ragusa Tr. at 307:1-11 (ECF 71-6.)

Plaintiff's handwritten notes during the August 4th meeting included the following: Plaintiff noted that Kovar expressed concern with the 40-hour per week 8-hour per day limitation; Plaintiff noted that Cassano said that her leadership had been sorely missed while she was on leave;  Plaintiff noted that Kovar said that the accommodation that was made in the fall of 2015 was not successful. Ragusa Tr. at 321:6-25, 322:1-10 (ECF 71-6.); See also (ECF 71-71.)

Plaintiff points out, however, that as reflected in the August 4, 2016 return to work memo from Zavalydriga, Defendant admitted that it was able to accommodate a 40-hour work week through September 22, 2016 because there were no productions during this period. Cassano dep., 74:19-24 (ECF 74-7, Ex. 3.)  Defendant also admitted that a 40-hour workweek was possible during part of December, the month of January, and possibly February. Zavalydriga. Tr., 193:13-194:14 (ECF 74-7, Ex. 4.) Cassano also testified that Defendant does not "track people on an hour-to-hour basis." Ex. 16, Cassano dep. vol. 2, 46:18-47:1-3, (ECF 74-10.)

However, Cassano testified that Defendant was unable to accommodate a 40-hour workweek for Plaintiff following September 22, 2016 because it became difficult for them to cover the lighting requirements for multiple productions and teaching responsibilities of Zoellner with the staff that they had. Other than the ability to cover the responsibilities of Zoellner with the staff that they had, Cassano was not aware of any other reason as to why a 40-hour workweek could allegedly not be accommodated for

Plaintiff past September 22, 2016. Cassano dep., 77:1-12, 86:23-87:8 (ECF 74-7, Ex. 3.)

Based on these material factual discrepancies, it will be up to a reasonable jury to make the appropriate credibility determinations and decide whether working more than 40 hours per week was an essential element of Plaintiff's job, and if so, whether Plaintiff could perform that element with or without reasonable accommodation.

Defendant also argues that teaching was an essential element of Plaintiff's job as lighting coordinator/adjunct professor. While Plaintiff does not dispute that teaching in some form was an essential element of her job, there is a genuine factual dispute as to whether Plaintiff refused to teach certain courses in the Fall Semester of 2016 and the Spring Semester of 2017 or if it was the Defendant who prevented her from doing so.

On the one hand, Cassano testified that he and Kovar had discussed that Plaintiff's "focus" upon returning to work full-time in the fall of 2016 should be on the "technical aspects of her job" "upon her immediate return to work" and, "before the return to classes started." Cassano Tr., vol. 2 at 24:18-24, 25:1-13, 27:3- 12, 28:1-19. (ECF 74-10, Ex. 16.)

Plaintiff testified that she recalled Kovar telling her during the August 4, 2016 meeting that she would not have any teaching responsibilities upon returning to work. Ragusa Meeting Notes 8/4/16 (ECF 71-71, Ex. 67) [Ragusa 330-332]; Ragusa Tr. at 321: 6-8, 322:18-25, 323:1, 22-25, 324:1-6 (ECF 71-6). Plaintiff testified that as a result of the limitation on the number of hours that she could work per week, Kovar told her that all of her time would have to be devoted to Zoellner and that she would not be teaching at all. Ragusa dep.,140:24-142:10 (ECF 74-12, Ex. 20); s*ee also (*ECF 74-13,

Ex. 31) (Kovar and Cassano informed Plaintiff that her focus needed to be on the non-teaching aspect of her job). Plaintiff further testified that she was told that 'I wasn't allowed to teach as a condition of my returning back to work. There wasn't an endpoint that I was given for not being able to teach as conditional as my return to work." Ex. 20, Ragusa dep., 141:7-19, 142:6-10 (ECF 74-12, Ex. 20.)

Erica Hoelscher ("Hoelscher"), the former Chair of the Department of Theater at Lehigh from 2013-2019, testified that Plaintiff's return to work in the Fall 2016 Semester being conditioned on the elimination of her instructional responsibilities was agreed to by Hoelscher, Kovar, and Cassano. Hoelscher dep., 128:7-12, 128:20-129:11 (ECF 74-5, Ex. 1.) Hoelscher testified that It was collaboratively decided among Hoelscher, Kovar, Cassano and Plaintiff that Plaintiff would work 40 hours a week during the Fall Semester of 2016 and that those hours "would be focused on her responsibilities outside of teaching."   Hoelscher dep., 126:18-128:12; see also (ECF 74-9, Ex. 6 at "Lehigh Ragusa 1832"); Ragusa dep.,140:24-142:10 (ECF 74-12, Ex. 20); see also (ECF 74-13, Ex. 31) (Kovar and Cassano informed Plaintiff that the majority of her focus needed to be on the non-teaching aspect of her job).

On August 13, 2016, Hoelscher responded to an email from Plaintiff in which Plaintiff wondered why she was still rostered to teach two of the three courses in the fall 2016 semester that were regularly assigned to her (Theater 28 and 69). Plaintiff had requested that a change be made and the two courses assigned to another faculty member. Hoelscher responded that the two other courses could not be turned over to the other faculty member due to his other courses and additional responsibilities. Hoelscher further wrote, "[t]hat said, **I know the conditions of your return include the**

**elimination of instructional responsibilities**, so I will be working out a solution with the department. It may take a while to have your named removed from the roster, but hopefully it will be done prior to the first day of classes." Hoelscher-Ragusa emails dated 8/13/16, (ECF 71-86, Ex. 82) [Lehigh Ragusa 001831- 32]; Ragusa Tr. at 331:10-25, 332:1-21 (ECF 71-6) (emphasis added.)

In addition, Plaintiff made a notation in her journal regarding a meeting which took place on October 4, 2016. Plaintiff's notes include the following: "Interactive Process- Teaching Responsibilities. My impression was that to return to work that I should not be teaching- Andy said that they did want me to focus on Center." Ragusa Journal Entry 10/4/16, (ECF 71-96, Ex. 92) [Ragusa 333]

Kovar testified that during the October 4, 2016 meeting related to her teaching responsibilities, Plaintiff expressed to Kovar, Cassano and Hoelscher a desire to reach a compromise on the number of hours she would devote to teaching during the Spring 2017 Semester. Kovar dep., 119:16-20 (ECF 74-6, Ex. 2); see also (ECF 74-15, Ex. 34.) Kovar admitted that he believed that Plaintiff was trying to reach a compromise on balancing teaching with the technical component of her job. *Id*. at 119:16-20. Cassano also admitted that Plaintiff was seeking a compromise in good faith during the October 4, 2016 meeting. Cassano dep. vol. 2, 32:22-33:1, 33:8-34:10 (ECF 74-10, Ex. 16.) According to Cassano, at no point during her employment with Defendant did Plaintiff ever do or say anything that he considered to be dishonest. Cassano dep., 172:21-173:1 (ECF 74-7, Ex. 3.)

On the other hand, the Interactive Process memo from the August 4, 2016 meeting states that during the meeting, Plaintiff represented that she had no adjunct

teaching responsibility for the fall 2016 semester. The memo states that Plaintiff agreed to confer with the Chair of the Department of Theatre to confirm that no adjunct responsibilities were expected from her for fall 2016 semester. ADA Interactive Process Memo dated 8/4/16, (ECF 71-72, Ex. 68.) [Lehigh Ragusa 001014].

Cassano confirmed that Plaintiff stated during the August 4, 2016 meeting that she had no adjunct responsibility for the fall 2016 semester. Cassano Tr. Vol. 2 at 112:4-8 (ECF 74-10, Ex. 16.) Cassano testified that he had no supervisory authority over Plaintiff's instructional responsibilities and that it was Hoelscher, who did not attend the meeting, who would have to resolve any issue regarding the teaching component of Plaintiff's job. Cassano Tr. Vol. 2 at 112:9-17; 118:8-21 (ECF 74-10.)

In addition, Kovar testified that Plaintiff not having any teaching responsibilities in the fall of 2016 was not clearly a condition of her return.  Kovar dep. 91:18-22 (ECF 74-6, Ex. 2.). Kovar also testified that it was his understanding that Plaintiff believed that it might have been difficult for her to resume teaching in the spring 2017 semester in addition to being responsible for all of her technical responsibilities with Zoellner, without some adjustment in general being made. Kovar dep., 118:1-119:15 (ECF 74-6, Ex. 2.); see also (ECF 74-13, Ex. 31.)

On September 5, 2016, Hoelscher wrote to Plaintiff to check in to see if Plaintiff would be rostering courses for the spring 2017 semester, noting that they would "love to have you back as an instructor." Plaintiff responded on September 7, 2016, "Hi Erica, [a]t this time, I cannot commit to teaching classes in the spring and I'm not sure if I will be able to commit by October either. It would be wise to plan on me not teaching

classes." Hoelscher-Ragusa Emails dated 9/5/16, (ECF 71-88, Ex. 84) [Lehigh Ragusa 001832-33]; Ragusa Tr. at 359:8-25, 360:1- 25, 361:1-6 (ECF 71-6.)

Kovar wrote a memo regarding the October 4, 2016 meeting. Kovar's notes include the following: Started conversation with discussion re teaching. Sue stated that I had told her she shouldn't be teaching. I stated that this was not the case because Sue mentioned that Erica [Hoelscher] had it covered for the first semester. Karen [Salvemini] stated that the difference in understandings between us is why we need to meet today. Andy [Cassano] stated that to be fair we did say that the majority of Sue's focus needed to be on the non-teaching aspects of the job. Erica stated that the teaching had not been taken care of on her end and she hadn't been invited to participate in the original meetings. Erica is looking for three courses to be covered. Sue states she and Devin [Kinch] are "unofficially" co-teaching 27 with Will [Lowry].... Sue doesn't think she can add teaching to her current load. She says 'something' would have to go. Kovar notes dated 10/4/16, (ECF 71-97, Ex. 93) [Lehigh Ragusa 002236]

Hoelscher testified that at the October 4, 2016 meeting, Plaintiff did not offer a compromise on the number of hours she would be willing to teach and that Plaintiff was refusing to teach. Hoelscher testified that she would have been open to a compromise, but the discussion never came up. Hoelscher dep.,157:22-162:19 (ECF 74-5, Ex.1.)

Hoelscher further testified that she could not discuss a potential compromise with Plaintiff related to her teaching responsibilities for the Spring 2017 Semester on the alleged basis that Plaintiff never sought a compromise and simply refused to teach at all. Hoelscher dep., 161:8-22 (ECF 74-5, Ex. 1.)

Finally, on October 12, 2016, Plaintiff supplied an updated Physician's Release covering the time-period from September 30, 2016 to December 30, 2016. The Release did not restrict Plaintiff from conducting her adjunct teaching duties. Ragusa Email dated 10/12/16, (ECF 71-98) [Lehigh Ragusa 001579-80]; Ragusa Tr. at 382:15-21 (ECF 71-6.)

As a result, the Court finds that while there is no genuine dispute as to whether teaching was an essential part of Plaintiff's job, there is a genuine dispute as to the material fact of whether Plaintiff refused to teach certain classes in the fall semester of 2016 and the spring semester of 2017 or whether the Defendant prevented Plaintiff from teaching during those periods. Questions of credibility on this issue will have to be resolved by a jury. As a result, the question of whether Plaintiff can satisfy the second element of her prima facie case for disability discrimination will have to be decided by a jury.

In her Amended Complaint, Plaintiff asserted two claims against Defendant for disability discrimination based on a failure to accommodate. The Court has already ruled that Plaintiff's claim for failure to accommodate based on Defendant refusing to allow Plaintiff to return to work on a part-time basis is time-barred. (ECF 29 and 30.) Therefore, the Court turns to Plaintiff's claim that Defendant failed to accommodate the Plaintiff by delaying the interactive process through June and July of 2016 and not meeting with Plaintiff to discuss her return to work until August 4, 2016.

In order for an employer "to be found liable for discrimination on the basis of failure to accommodate, the Plaintiff must produce evidence that: "(1) [s]he was disabled and his employer knew it; (2) [s]he requested an accommodation or

assistance; (3) h[er] employer did not make a good faith effort to assist; and (4) [s]he could have been reasonably accommodated." *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 157 (3d Cir. 2017) (quoting *Armstrong v. Burdette Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006)) (additional citations omitted). A reasonable accommodation is one that enable[s] an individual with a disability who is qualified to perform the essential functions of that position … [or] to enjoy equal benefits and privileges of employment. 29 C.F.R. § 1630.2(o)(1)(ii)-(iii).

As discussed, *supra*, there is a factual dispute over whether working over 40 hours per week was an essential function of Plaintiff's job and whether Plaintiff refused to perform an essential function of job (teaching) or the Defendant prevented the Plaintiff from doing so. Therefore, until a jury makes the proper credibility determinations on the issues of whether Plaintiff was qualified to perform the essential functions of her job, the Court will have to deny the motion for summary judgment as to Plaintiff's failure to accommodate claim.

Plaintiff has also asserted claims for retaliation under both the ADA and the FMLA. Prima facie claims of retaliation under the ADA and the FMLA require the plaintiff to establish: (1) a protected employee activity; (2) an "adverse action by the employer either after or contemporaneous with the employee's protected activity;" and (3) "a causal connection between the employee's protected activity and the employer's adverse action." *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 759 (3d Cir. 2004) (internal quotation marks omitted) (regarding the ADA), *superseded by statute on other grounds*, the ADA Amendments Act of 2008; *Conoshenti, v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 146* (3d Cir. 2004) (regarding FMLA claims).

"With respect to the causation component, the court must consider whether 'a reasonable jury could link the employer's conduct to the retaliatory animus.' " *Larochelle v. Wilmac Corp., 210 F. Supp. 3d 658, 698 (E.D. Pa. 2016) (quoting Jensen v. Potter, 435 F.3d 444, 449 n.2 (3d Cir. 2006) ), aff'd*, 769 Fed.Appx. 57 (3d Cir. 2019). Causation can be shown through temporal proximity between the protected activity and the adverse employment action; an intervening pattern of antagonism; or the evidence taken as a whole. See *Farrell v. Planters Lifesavers Co*., 206 F.3d 271, 280-81 (3d Cir. 2000); see also *Capps* 847 F.3d at 152 n.6 (providing the same in connection with FMLA retaliation).

Although temporal proximity alone can in some instances establish causation, in order to do so, "the difference in time must be measured in days, rather than in weeks or months." *Fischer v. Transue*, No. 04-2756, 2008 WL 3981521, at *10 (M.D. Pa. Aug 22, 2008). While a pattern of antagonism sufficient to show retaliatory motive need not rise to the level of a hostile work environment claim, *Popko v. Pa. State Milton S. Hershey Med. Ctr*.,  2014 WL 3508077, at *9 (M.D. Pa. July 14, 2014) (citing *Staffieri v. Nw. Human Servs., Inc*., No. 12  -1612, 2013 WL 2245639, at *8 (E.D. Pa. May 22, 2013)), the employer's alleged antagonism must be consistent and continuous, see *Wright v. Shore Mem. Hosp*., No. 11  -5583, 2013 WL 6080072, at *12(D.N.J. Nov. 19, 2013) (collecting cases and noting that "[c]ourts in this Circuit permit an inference of causation when there is a consistent, continuous course of discriminatory treatment") Compare *Bartos v. MHM Correctional Services, Inc*., 454 F. App'x 74, 75–76, 78–79 (finding antagonism insufficiently consistent and continuous where plaintiff was subject to five disciplinary actions over the course of fifteen months), and *Wells  v.*

*Retinovitreous Associates, Ltd.*, 2016 WL 3405457, at *1, 3 (E.D. Pa. June 21, 2016) (finding four disciplinary actions in four-month span insufficient to show a pattern of antagonism), with *Robinson v. Southeastern Pennsylvania Transportation Authority*, 982 F.2d 892, 895 (3d Cir. 1993) (upholding district court's finding of a pattern of antagonism where employee was subjected to a "constant barrage of written and verbal warnings, inaccurate point totals, and disciplinary action, all of which occurred soon after plaintiff's initial complaints and continued until his discharge.")

Plaintiff asserts that the protected employee activities she engaged in for purposes of the ADA were requesting a workplace accommodation in June, 2016, raising an informal complaint of disability discrimination based on failure to accommodate her request to return to part-time work with Defendant on June 21, 2016, and subsequently filing a formal complaint raising the same allegations on July 22, 2016. (ECF 74-13, Ex. 28) [Lehigh Ragusa 1052.] The adverse action taken by Defendant was Plaintiff's termination in November, 2016.

Defendant argues that it is entitled to summary judgment on this claim because the temporal proximity between Plaintiff's protected activities and the Defendant's adverse action can only be measured in months, not days, and that in any event, there was not a sufficient pattern of antagonism shown by Defendant toward Plaintiff after June 21, 2016 through November, 2016.

Plaintiff responds that Kovar, Cassano and Kimberly Drey, three of the four decision-makers, were not informed of Plaintiff's complaints of discrimination until August 11, 2016, thereby resulting in a shorter temporal proximity to Plaintiff's November 2016 termination. (ECF 74-15, Exs. 36, 37, 38.) As examples of Defendant's

antagonism that allegedly took place after August 11, 2016, Plaintiff points out that despite Defendant's agreement to accommodate Plaintiff's physical restrictions on August 4, 2016, Kovar denied a request from Plaintiff for physical help from her assistant, Mr. Kinch. Ragusa dep., 119:18- 120:11 (ECF 74-12, Ex. 20); at times during the Fall 2016 Semester, Kovar required Plaintiff to work beyond her hourly restriction of 40 hours per week and eight hours per day. Ragusa dep., 146:6-13 (ECF. 74-12. Ex. 20); and following Plaintiff's return on August 8, 2016, Kovar did not allow Plaintiff to work from home the way he had in the Fall of 2015. Ex 2., Kovar dep., 218:18-220:10 (ECF 74-6, Ex. 2.)

Even accepting August 11, 2016 as the date of the protected activity, the three - month period that followed before Plaintiff was terminated is too lengthy a period to establish temporal proximity to Plaintiff's termination in November. In addition, the Court finds as a matter of law that no reasonable jury could find that even if Plaintiff's referenced acts qualify as antagonistic, there is no evidence that such acts were consistent and continuous. The record does not contain evidence of any disciplinary actions being taken against Plaintiff by Defendant. Nor is there any evidence that Plaintiff ever received any written or verbal warnings from Defendant. Although Plaintiff claims that she was excluded from meetings, told to "shut up" in front of co-workers, and given a lower raise than in previous years, Plaintiff's only support for such claims are her own allegations in her Complaint. (ECF 20 at ¶¶ 48-49.) However, none of these allegations were ever flushed out during discovery.  For the same reasons, even when the evidence is taken as a whole, there is no basis for drawing a causal connection

between Plaintiff's protected activities and her termination. Therefore, Defendant is entitled to summary judgment on Plaintiff's claim of retaliation under the ADA.

Plaintiff asserts that for purposes of the FMLA, the protected activity she engaged in was taking a leave of absence pursuant to the FMLA on February 1, 2016 and the adverse actions taken by Defendant were refusing to allow Plaintiff to work on a part-time basis in June of 2016 and terminating her in November, 2016.

Again, the record does not contain any evidence of consistent and continuous acts of antagonism on the part of Defendant as a result of Plaintiff having taken a leave of absence pursuant to the FMLA on February 1, 2016 until the time her request to return part-time was denied on June 10, 2016 or through the time she was terminated in November, 2016. Accordingly, judgment will be entered in favor of Defendant and against Plaintiff on her claims for retaliation under the FMLA.

Plaintiff's final claim is for a hostile work environment under the ADA. To meet the elements of a hostile work environment claim under the ADA, Plaintiff must show that: (1) she is a qualified individual with a disability under the ADA; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment, and; (5) that Defendant knew or should have known of the harassment and failed to take prompt effective remedial action. *Walton v. Mental Health Ass'n of Southeastern Pa.*, 168 F.3d 661, 666 (3d Cir. 1999) (citing *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir. 1998)).

A hostile work environment claim requires that "the harassment 'was sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create and abusive working environment.'" *Walton*, 168 F.3d at 667 (quoting *Harris*, 510 U.S. at 21). This inquiry considers all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

Even assuming, *arguendo*, that Plaintiff was a qualified individual with a disability and that there is evidence in the record to conclude that Plaintiff was harassed on the basis of her disability, there is simply no evidence in the record from which a reasonable jury could conclude that any harassment on the part of the Defendant was severe or pervasive. Again. the only evidence of harassment Plaintiff points to is that despite Defendant's agreement to accommodate Plaintiff's physical restrictions on August 4, 2016, Kovar denied a request from Plaintiff for physical help from Mr. Kinch. Ragusa dep., 119:18- 120:11 (ECF 74-12, Ex. 20); at times during the Fall 2016 Semester, Kovar required Plaintiff to work beyond her hourly restriction of 40 hours per week and eight hours per day. Ragusa dep., 146:6-13 (ECF 74-12, Ex. 20); and following Plaintiff's return on August 8, 2016, Kovar did not allow Plaintiff to work from home the way he had in the Fall of 2015. Kovar dep., 218:18-220:10 (ECF 74-6, Ex. 2.) As discussed above, although Plaintiff claims that she was excluded from meetings, told to "shut up" in front of co-workers, and given a lower raise than in previous years, Plaintiff's only support for such claims are her own allegations in her Amended Complaint. (ECF 20 at ¶¶ 48-49.) However, as just noted, none of these allegations

were never flushed out during discovery.  Accordingly, judgment will be entered in favor

of Defendant and against Plaintiff on Plaintiff's claim for a hostile work environment

under the ADA.